NOTICE

Decision filed 04/11/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220694-U

NO. 5-22-0694

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wabash County. |
| | ) | |
| v. | ) | No. 21-CF-35 |
| | ) | |
| ADAM W. VAIRA, | ) | Honorable |
| | ) | Michael J. Valentine, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice McHaney and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient for a jury to find defendant guilty of two counts of predatory criminal sexual assault of a child and four counts of aggravated criminal sexual abuse, and count V of the information was not void for duplicity.

¶ 2    The defendant, Adam Vaira, appeals a Wabash County jury trial conviction for two counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2000)) and four counts of aggravated criminal sexual abuse (*id.* § 12-16(b)). On appeal, defendant argues that there was insufficient evidence presented to support his convictions as to all six counts. He also argues that count V of the information was void for duplicity, when two separate occurrences on different dates could meet the crime alleged in count V. For the following reasons, we affirm.

1

¶ 3                              I. BACKGROUND

¶ 4      On May 3, 2021, the State charged defendant by six count information, in Wabash County

(21-CF-35), with two counts of predatory criminal sexual assault of a child (counts I and V), Class

X felonies (*id.* § 12-14.1(a)(1)), and four counts of aggravated criminal sexual abuse (counts II,

III, IV, and VI), Class 2 felonies (*id.* § 12-16(b)).[1]

¶ 5      Count I alleged that between May 1, 2000, and December 10, 2002, defendant committed

the offense of predatory criminal sexual assault of a child in that defendant committed an act of

sexual penetration by the insertion of his finger into the vagina of C.D. Count II alleged that

between May 1, 2000, and December 11, 2003, defendant committed the offense of aggravated

criminal sexual abuse, in that defendant committed an act of sexual conduct by forcing the hand

of C.D. to fondle the penis of the defendant at a time when C.D. was both under the age of 18 years

and a family member of the defendant. Count III alleged that between the dates of May 1, 2000,

and December 11, 2003 defendant committed the offense of aggravated criminal sexual abuse in

that defendant committed an act of sexual conduct by rubbing his penis on the vagina C.D. at a

time when C.D. was both under the age of 18 and a family member of the defendant. Count IV

alleged that between the dates of May 1, 2000, and December 11, 2003, defendant committed the

offense of aggravated criminal sexual abuse in that defendant committed an act of sexual conduct

by rubbing his penis on the face of C.D. at a time when C.D. was under the age of 18 and a family

member of defendant.

¶ 6      Count V alleged that between the dates of May 1, 2000, and August 2, 2006, defendant

committed the offense of predatory criminal sexual assault of a child, in that defendant committed

---

[1]There were two victims named in the charges: counts I-IV alleged defendant committed offenses against a Jane Doe with a date of birth of December 11, 1989, and counts V and VI alleged defendant committed offenses against a Jane Doe with a date of birth of August 3, 1993.

an act of sexual penetration by the insertion of his finger into the vagina of F.D. at a time when F.D. was under the age of 13 years and the defendant was 17 years of age or older. Count VI alleged that between May 1, 2000, and January 2, 2007, defendant committed the offense of aggravated criminal sexual abuse in that defendant committed an act of sexual conduct by rubbing his penis on the face of F.D. a time when F.D. was under the age of 18 and a family member of the defendant.

¶ 7　Following two days of jury selection, on August 3, 2022, the matter proceeded to trial. Following opening statements, the State called C.D. as its first witness. At the time of trial, C.D. was 32 years old. C.D. was born on December 11, 1989. C.D. testified that defendant was married to her mother for 11 years. The two married when C.D. was approximately seven years old. C.D. was approximately 17 years old when her mother and defendant divorced. During the marriage, C.D. lived with her mother and defendant. Her sister, F.D., and two other half-brothers also resided in the home. C.D.'s half-brother Tyler was defendant's son from a prior relationship. C.D.'s half-brother Miles was born to her mother and defendant during their marriage.

¶ 8　Early on, the family resided on Walnut Street. C.D. recalled her first "inappropriate" interaction with defendant. C.D.'s mother worked at the Family Dollar across the street. C.D. recalled her mother went to work, and she sat on the couch with defendant watching a movie. C.D. testified that defendant "proceeded to grab a blanket and grabbed my hand and caressed his erection." C.D. testified that defendant "had clothes on."

¶ 9　C.D. did not recall any other instances occurring while living on Walnut Street. The family moved to College Drive. When the family lived on College Drive, C.D.'s mother worked nights. C.D. testified that she and her siblings "were home alone at night with" defendant. C.D. recalled that defendant "would pick me up on his back and give me piggyback rides and insert his thumb

3

inside of my vagina." C.D. testified that she was 10 years old when this occurred. She testified that at "first" this occurred while she wore a "nightgown with underwear." "After a time, though, he requested me to not wear underwear anymore." C.D. testified that F.D. and her brother were in the home when this occurred.

¶ 10    C.D. testified that these occurrences were "painful" and "uncomfortable." She testified that there was emotional pain as well as physical pain. C.D. testified that "one time I got cut by, I would assume, a fingernail" and she "woke up the next morning with blood in my underwear." C.D. testified that this occurred "[o]ften enough for it to just be normal" and indicated that it likely occurred "[m]ore than ten" times. C.D. testified that she "witnessed him giving [F.D.] piggyback rides with the same request." C.D. did not actually see defendant "physically stick his thumb inside of" F.D. C.D. testified that this occurred over the course of years.

¶ 11    C.D. testified that while living at the College Drive home, defendant would cook dinner and "trap my sister and I under his shirt while he had an erection and proceed to stir food and poke us with his erection." C.D. clarified that defendant would pull his shirt over her head while he was standing. C.D. was also standing, but she was at his hip-level. C.D. was approximately 10 years old when this first started. When defendant pulled C.D., and often F.D., too, under his shirt, he was erect. Defendant would "stir food on the stove." Defendant "would intentionally turn a little to stir." As he turned, "he would poke us with it." C.D. testified that this occurred until their youngest brother was born.

¶ 12    On cross-examination, C.D. testified that defendant's "elbow would push [her] head down," which would put her face "at eye level" with defendant's erection. On cross-examination, defense counsel asked, "So it wasn't just that he would move, he would force your head down?"

4

C.D. responded, "Yes." When discussing the kitchen incidents, the following exchange occurred on cross-examination:

> "Q. Did you actually ever, in fact, tell him that [defendant's] penis touched your face?
> A. No. I mean, there was times that the head of his penis would come out of his pants while we were under his shirt. And, I mean, turning while he's stirring, it's possible it happened. I don't know …
> Q. So did—other than possible—
> A. Uh-huh.
> Q. —as you sit here today with your memory, do you remember with that situation in the kitchen [defendant's] penis touching your face?
> A. No."

¶ 13 While living on College Drive, defendant watched porn with C.D. present. She testified that he brought her into his bedroom and locked the door while watching porn. C.D. was approximately 11 when this occurred. C.D. testified that while the porn was playing, defendant "would put my hand on his erection and proceed to stroke my hand until he ejaculated." She testified that she touched him over his clothes, however, the "head of his penis would be poking out of his pajama pants." C.D. testified that semen got on her person. C.D. testified that this occurred over the course of years. She was 12 the last time that it happened. C.D. recalled specifically when it ended, because it was when she had her first menstrual cycle. Following her first period, "it all completely stopped."

¶ 14 While living on College Drive, C.D. testified that on "multiple occasions" defendant placed her on his lap and had her "straddle him" while he held her hips. Defendant rocked her back and forth until he ejaculated. This took place in the living room. C.D. testified that she was 10, 11, and 12, when this occurred. C.D. wore a nightgown with no underwear when this occurred. Defendant asked her not to wear underwear during these events. C.D. testified that her "vagina is rubbing up against his erection until he ejaculates." Defendant wore pants, but he did not wear underwear. However, the head of his penis was visible out of the top of his pajama pants. Following

ejaculation, C.D. went to the bedroom and into the bathroom to "clean" herself, because defendant's semen was on her thighs. This occurred when C.D.'s mother was at work.

¶ 15 C.D. testified that she was 10 years old when she learned about the "white stuff." She testified that defendant was lying on the couch, and she was lying on top of him. Defendant used her body to rub him up and down. When defendant ejaculated, he sat up. C.D. asked "what is all that white stuff" and defendant "panicked." C.D. had a nightgown on with no underwear.

¶ 16 C.D. testified that defendant would play the "kissy game" with her and F.D. Defendant would "kiss us like we were adults and stick his tongue in our mouths." This began when C.D. was 10. This occurred over the course of months. C.D. did not recall it happening as she got older. This "game" occurred with both girls together. Defendant sat in the middle of the girls and went back and forth between them kissing "open-mouth kissing, putting his tongue inside of my mouth, and he would ask me to do the same thing to him." C.D.'s brother was not around while this occurred.

¶ 17 C.D. testified that defendant threatened her that if she told anyone "he would kill me." She testified that he "told [her] that then he would have to go to jail for a really long time." C.D. was in eighth grade when he threatened her.

¶ 18 On cross-examination, C.D. clarified that Tyler was approximately 15 months younger than her. F.D. was younger than her. F.D.'s birthday was August 3, 1993. The youngest brother, Miles, was 11 years younger than C.D., born January 9, 2001.

¶ 19 The State next called F.D. She was 29 years old at the time of testifying. She was born on August 3, 1993. F.D. knew defendant, because he married her mother when F.D. was three years old. F.D. was approximately 13 years old at the time of their divorce. During the marriage, F.D. was often in the care of defendant while her mother worked.

6

¶ 20    While living on College Drive, defendant would play the "kissing game" with F.D. and C.D. "He would put [C.D.] on one leg, and he would put me on the other leg. And he would go back and forth between both of us and turn his head, and he would put his tongue in our mouth. And he would do it to both of us at the same time." F.D. testified that her mother was working nights and was not home when this occurred. F.D. testified that this occurred more than once, although there was only "a specific moment" that she could recall.

¶ 21    F.D. testified that while living in the College Drive home, defendant would be in the kitchen cooking dinner with an "erection." Defendant "would put mine and [C.D.'s] head underneath his shirt." At the time, F.D. thought it was funny. She recalled that she "could clearly see that he had an erection." She clarified that "his erection would be in between the both of us," "[r]ight in front of my face." F.D. had "one memory of that." She could not recall how old she was, but it was while defendant and her mother were married and living at the College Drive home.

¶ 22    F.D. testified that defendant gave her piggyback rides. Defendant stuck his thumb up her vagina while she was on his back. This occurred "more than once" over the course of "years." F.D. testified that defendant did this to C.D. as well. F.D. testified that she was "fully clothed" and had "underwear on" but defendant "would go under [her] underwear with his thumbs." F.D. testified that defendant used "both his thumbs." F.D. did not recall wearing nightgowns at home. F.D. testified that the piggyback rides ended when defendant and her mother divorced, when F.D. was 13.

¶ 23    F.D. testified that the family was in Oakland City at her aunt's house for New Year's Eve. F.D. was on the couch feeling tired. Defendant carried her to her mother's van. Defendant "cradled" her and unbuttoned and unzipped her pants. Defendant put "his fingers in [F.D.] the whole way home" while F.D.'s mother drove the van home. F.D. tried to "push [her] foot against

7

his arm and pin it up against the door to try and get him to stop." However, she "wasn't strong enough to get him to stop." She did not ask her mother for help. She "tried to act like [she] was asleep." F.D. testified that defendant went underneath her underwear and inserted what she believed to be his thumb into her vagina. F.D. believed that she was seven years old when this occurred.

¶ 24 Following the divorce, F.D. did not maintain a relationship with defendant. F.D. had a rocky relationship with her mother and C.D. F.D. testified that in fifth grade she was questioned by the Department of Children and Family Services (DCFS), but she did not make a disclosure to them.

¶ 25 Next, the State called Jennifer Hale, C.D. and F.D.'s mother. Hale was married to defendant from January 1997 to June 2007. The family resided on Walnut Street while Hale worked at Family Dollar. Then the family moved to College Drive in February of 2000. Hale became the manager of Family Dollar and worked long hours, including night hours and weekend shifts. Following the birth of Hale and defendant's son, she had a new employer, but still worked the night shift from the end of April 2003 until October 2003. While working the night shift, the children were home with defendant. Defendant often wore pajama pants and white tank tops around the home.

¶ 26 Hale testified that the family owned a purple Dodge Grand Caravan while living on College Drive. Hale recalled driving home from Aunt Elaine's house on New Year's Eve of 2000, while pregnant with her youngest son. Defendant had been drinking. C.D. and Tyler sat in the back seat and defendant held F.D. in the middle seat. Hale testified that it was "out of character" for defendant to hold F.D. on the way home, because usually "we strapped the children in." Defendant "carried her" because F.D. was asleep.

8

¶ 27    Hale testified that in 2021, she attended Elaine's wedding. Both F.D. and C.D. were present. C.D. left following the wedding ceremony, but F.D. stayed at the wedding. At that time, Hale and F.D. were not speaking to one another. However, F.D. spoke to Hale outside following the wedding about defendant. The following day, Hale called C.D. about defendant. As a result of the conversation with F.D. on February 27, 2021, and the conversation with C.D. on February 28, 2021, Hale made a police report. Hale contacted the police on March 2, 2021.

¶ 28    Special Agent Mark Perry from the Illinois State Police testified. Perry was contacted by the local police department to advise him that Jennifer Hale made a report on March 2, 2021, that her two daughters were victims of sexual abuse. Perry conducted interviews with the family. Perry interviewed F.D., Jennifer Hale, Tyler, Miles, and C.D. The interviews were audio and video recorded. Because F.D. raised concerns that defendant sometimes provided care for other children, Perry contacted DCFS.

¶ 29    The State called Tyler. At the time of testifying, Tyler was 31 years old. Tyler was defendant's son and the brother of C.D. and F.D. Tyler testified that he confronted his dad in March of 2021, when Tyler became aware that the Illinois State Police were investigating defendant. Upon confronting defendant, Tyler testified that defendant said: "He said that he was going to have to plead guilty to it because he didn't really want to fight about it. And then he mentioned that he had a—or he was going to lose his business and that he really had to get some work going so he could afford a lawyer. And I proceeded to tell him that [F.D.] wasn't the only one that was coming out. [C.D.] also was going to come out and, you know, say that he had done stuff to her, too."

¶ 30    Tyler testified that defendant said he "never touched" F.D. However, defendant gave Tyler "a couple of details that he did with" C.D. Tyler testified that defendant "said that he would have her rub on his penis and that he would have her sit on him and ride him." Tyler testified that he

9

was "shocked that it was true" and defendant said that he was "lonely and sick." Tyler testified that defendant "told [him] not to say anything."

¶ 31    Tyler testified that as a child he walked into the living room and saw his "sister laying on top of him underneath a blanket." Tyler testified "right then and there, I knew that memory that I had was, you know, supported with what he had said." When Tyler walked in, defendant "pushed her off and kept the blanket on top of him." Tyler recalled walking out and going back upstairs. Tyler testified that this occurred at the College Drive house. He did not recall how old he was. Tyler recalled seemingly from another incident, C.D. coming upstairs and saying "that she hoped she didn't get pregnant because she seen white stuff coming out of him."

¶ 32    Tyler testified that when the family left a New Year's Eve party, defendant held F.D. in the car on the way home. Defendant held F.D. "while we were driving." Tyler testified that he "thought it was weird that he was holding her." Prior to learning about the abuse, Tyler testified that his dad was his "best friend" and they saw each other on a daily basis. Tyler worked with his dad.

¶ 33    The State rested. Defendant moved for a directed verdict on all six counts, arguing that the State failed to meet its level of proof. Following argument from the parties, the court denied the motion for a directed verdict on all six counts.

¶ 34    During this time, defense counsel raised an issue as to whether the State could make an argument that there was more than one instance of predatory criminal sexual assault against F.D., when only one count was charged. The State noted that the information as charged in count V noted that defendant inserted a finger into the vagina of Jane Doe, born August 3, 1993. Either the piggyback incident or the minivan incident described by F.D. would meet the allegation as set forth in count V. The court noted that both allegations took place during the time period. Although

10

the State could have charged two separate counts based on the two separate acts, it did not. As such, defendant was not prejudiced. The court noted that defendant was on notice based on the discovery in this case, and this issue could have been litigated pretrial. However, the court noted that "the defense obviously can argue, well, you know, if the State was so sure, they should have charged it twice."

¶ 35 Defendant testified. Defendant denied committing any sexual acts with either C.D. or F.D. Defendant recalled being confronted by his sons. Defendant testified that he told his sons, "I'm finished. I'm going to lose my reputation. I'm going to have to call a lawyer. I can't afford one." Defendant clarified that he felt that he was "done for" because of the "allegations against" him. Defendant denied telling Tyler that he never touched F.D. but he touched C.D. Defendant testified that he performed construction work for C.D. and recently went on vacation with her and Miles. On cross-examination, defendant testified that he drank a "couple beers a day." Defendant admitted that he had pornography in the home. Defendant recalled the New Year's party, acknowledged that he had been drinking, and held F.D. in the minivan on the drive home. Defendant denied the sexual allegations against him.

¶ 36 The defense rested. Following jury instruction conference, defense counsel noted an "ongoing objection" "regarding the State being allowed to essentially argue or ask the jury to convict on more than one action for only one charged offense." The trial court overruled the objection, noting that both acts were alleged to have taken place within the time frame charged. The court also noted that all of the alleged acts were disclosed to the defense "well in advance of trial." Following closing arguments from the attorneys, the jury was instructed and sent to deliberations. After two and a half hours of deliberation, the jury found defendant guilty on all six counts.

¶ 37 Defendant filed a "motion for judgment notwithstanding the verdict or, in the alternative, a new trial." In his motion, he raised a slew of issues. Relevant to this appeal, defendant argued that the State failed to prove him guilty beyond a reasonable doubt on counts IV and VI. Defendant also argued that the State failed to prove him guilty beyond a reasonable doubt on count V, and the trial court erred by denying defendant's motion for a directed verdict on count V. Defendant also argued that the court erred by allowing the State to argue two separate and independent factual events for counts V and II.

¶ 38 On September 22, 2022, the trial court sentenced defendant to natural life in prison on count I (predatory criminal sexual assault of C.D.) and count V (predatory criminal sexual assault of F.D.). The court sentenced defendant to seven years, to run consecutively, on counts II, III, IV, and VI.

¶ 39 This timely appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41 On appeal, defendant argues that the evidence was insufficient to find him guilty beyond a reasonable doubt. Defendant also argues that the information for count V was void for duplicity, because the State argued that either the allegation that defendant inserted his finger into the vagina of F.D. while in a vehicle or the allegation stemming from a piggyback occurrence on a different date was sufficient to convict defendant of the crime alleged in count V. The State contends that the evidence was sufficient, and the information was valid. For the reasons that follow, we agree with the State and affirm.

¶ 42                                    A. Sufficiency

¶ 43 Defendant argues that there was insufficient evidence to convict him of two counts of predatory criminal sexual assault of a child and four counts of aggravated criminal sexual abuse

12

as to C.D. and F.D. For the reasons that follow, we find sufficient evidence to support defendant's convictions for predatory criminal sexual assault of a child and aggravated criminal sexual abuse. We consider each conviction in turn, along with defendant's specific allegations.

¶ 44    "When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Sauls*, 2022 IL 127732, ¶ 52. This court will not reverse a conviction on sufficiency grounds unless the evidence was so "unreasonable, improbable, or unsatisfactory" that, even when viewed in the light most favorable to the State, no rational trier of fact could accept it as proof beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008); see *Jackson v. Virginia*, 443 U.S. 307 (1979). The findings made by the trier of fact regarding the credibility of witnesses, the inferences to be drawn from the evidence, and the resolution of conflicts in the evidence are all entitled to significant deference. *Ross*, 229 Ill. 2d at 272.

¶ 45    In the case before us, defendant was convicted of two counts of predatory criminal sexual assault of a child and four counts of aggravated criminal sexual abuse. To prove defendant guilty of predatory criminal sexual assault, the State had to prove that defendant committed an act of "sexual penetration" with the victim at a time when the accused is 17 years or older and the victim is under 13 years old. 720 ILCS 5/12-14.1(a)(1) (West 2000). "Sexual penetration" is defined as "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration." *Id.* § 12-12(f).

¶ 46    A person commits aggravated criminal sexual abuse when he "commits an act of sexual conduct with a victim who was under 18 years of age when the act was committed and the accused was a family member." *Id.* § 12-16(b). "Sexual conduct" means "any intentional or knowing touching or fondling by *** the accused, either directly or through clothing, of the sex organs, anus or breast of the victim ***, or any part of the body of a child under 13 years of age *** for the purpose of sexual gratification or arousal." *Id.* § 12-12(e). "A defendant's intent to arouse or gratify himself sexually can be inferred solely from the nature of the act." *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010).

¶ 47    Count I alleged that between May 1, 2000, and December 10, 2002, defendant committed the offense of predatory criminal sexual assault of a child in that defendant, knowing that C.D. was unable to give knowing consent, committed an act of sexual penetration by the insertion of his finger into the vagina of C.D., a female minor child born on December 11, 1989, at a time when C.D. was under the age of 13 years and defendant was 17 years of age or older, in violation of 12-14.1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/12-14.1(a)(1) (West 2000)), a Class X felony. C.D.'s testimony established that she was born on December 11, 1989. C.D. testified that defendant was married to her mother for 11 years. The two married when C.D. was approximately seven years old. C.D. was approximately 17 years old when her mother and defendant divorced. During the marriage, C.D. lived with her mother and defendant.

¶ 48    When the family lived on College Drive, C.D.'s mother worked nights. C.D. testified that she and her siblings "were home alone at night with" defendant. C.D. recalled that defendant "would pick me up on his back and give me piggyback rides and insert his thumb inside of my vagina." C.D. testified that she was 10 years old when this occurred. She testified that at "first" this occurred while she wore a "nightgown with underwear." "After a time, though, he requested

14

me to not wear underwear anymore." C.D. testified that F.D. and her brother were in the home when this occurred.

¶ 49    C.D. testified that these occurrences were "painful" and "uncomfortable." She testified that there was emotional pain as well as physical pain. C.D. testified that "one time I got cut by, I would assume, a fingernail" and she "woke up the next morning with blood in my underwear." C.D. testified that this occurred "[o]ften enough for it to just be normal" and indicated that it likely occurred "[m]ore than ten" times.

¶ 50    Although "the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant" (*People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009)), we note that C.D.'s testimony was corroborated by the testimony of her sister F.D. and defendant's own testimony. F.D. recounted a nearly identical experience. F.D. testified that defendant gave her piggyback rides. Defendant stuck his thumb up her vagina while she was on his back. This occurred "more than once" over the course of "years." Additionally, in his own testimony, defendant himself testified that he often gave C.D. piggyback rides while living at the College Drive address. Viewing this evidence in the light most favorable to the State, we conclude that a rational juror could have found that defendant committed the offense of predatory criminal sexual assault of a child in that defendant committed an act of sexual penetration by the insertion of his finger into the vagina of C.D.

¶ 51    Count II alleged that between May 1, 2000, and December 11, 2003, defendant committed the offense of aggravated criminal sexual abuse, in that defendant committed an act of sexual conduct by forcing the hand of C.D., a female minor child born on December 11, 1989, to fondle the penis of the defendant, at a time when C.D. was both under the age of 18 years and a family member of the defendant, in violation of section 12-16(b) of the Code (720 ILCS 5/12-16(b) (West

2000)), a Class 2 felony. C.D. testified that, early on, the family resided on Walnut Street. Jennifer Hale, C.D.'s mother, F.D., and defendant himself, all corroborated this information. While living in the Walnut Street home, C.D. recalled her first "inappropriate" interaction with defendant. C.D.'s mother worked at the Family Dollar across the street. C.D. recalled her mother went to work, and she sat on the couch with defendant watching a movie. C.D. testified that defendant "proceeded to grab a blanket and grabbed my hand and caressed his erection." C.D. testified that defendant "had clothes on."

¶ 52    While living on College Drive, defendant watched porn with C.D. present. She testified that he brought her into his bedroom and locked the door while watching porn. C.D. was approximately 11 when this occurred. C.D. testified that while the porn was playing, defendant "would put my hand on his erection and proceed to stroke my hand until he ejaculated." She testified that she touched him over his clothes, however, the "head of his penis would be poking out of his pajama pants." C.D. testified that semen got on her person. C.D. testified that this occurred over the course of years. She was 12 the last time that it happened. C.D. recalled specifically when it ended, because it was when she had her first menstrual cycle. Following her first period, "it all completely stopped."

¶ 53    Tyler testified that upon confronting defendant, defendant said he "never touched" F.D. However, defendant gave Tyler "a couple of details that he did with" C.D. Tyler testified that defendant "said that he would have her rub on his penis and that he would have her sit on him and ride him." Tyler testified that he was "shocked that it was true" and defendant said that he was "lonely and sick." Tyler testified that defendant "told [him] not to say anything." Viewing this evidence in the light most favorable to the State, we conclude that a rational juror could have found

16

that defendant committed the offense of aggravated criminal sexual abuse when defendant committed an act of sexual conduct by forcing the hand of C.D. to fondle his penis.

¶ 54 Count III alleged that between the dates of May 1, 2000, and December 11, 2003, defendant committed the offense of aggravated criminal sexual abuse in that defendant committed an act of sexual conduct by rubbing his penis on the vagina of C.D., a female minor child born on December 11, 1989, at a time when C.D. was both under the age of 18 and a family member of the defendant, in violation of section 12-16(b) of the Code (*id.*), a Class 2 felony. While living on College Drive, C.D. testified that on "multiple occasions" defendant placed her on his lap and had her "straddle him" while he held her hips. Defendant rocked her back and forth until he ejaculated. This took place in the living room. C.D. testified that she was 10, 11, and 12, when this occurred. C.D. wore a nightgown with no underwear when this occurred. Defendant asked her not to wear underwear during these events. C.D. testified that her "vagina is rubbing up against his erection until he ejaculates." Defendant wore pants, but he did not wear underwear. However, the head of his penis was visible out of the top of his pajama pants. Following ejaculation, C.D. went to the bedroom and into the bathroom to "clean" herself, because defendant's semen was on her thighs. This occurred when C.D.'s mother was at work.

¶ 55 C.D. testified that she was 10 years old when she learned about the "white stuff." She testified that defendant was lying on the couch, and she was lying on top of him. Defendant used her body to rub him up and down. When defendant ejaculated, he sat up. C.D. asked "what is all that white stuff" and defendant "panicked." C.D. had a nightgown on with no underwear.

¶ 56 Again, Tyler corroborated C.D.'s testimony, where Tyler testified that as a child he walked into the living room and saw his "sister laying on top of him underneath a blanket." Tyler testified "right then and there, I knew that memory that I had was, you know, supported with what he had

17

said." When Tyler walked in, defendant "pushed her off and kept the blanket on top of him." Tyler recalled walking out and going back upstairs. Tyler testified that this occurred at the College Drive house. He did not recall how old he was. Tyler recalled seemingly from another incident, C.D. coming upstairs and saying "that she hoped she didn't get pregnant because she seen white stuff coming out of him." Additionally, Tyler testified defendant gave Tyler "a couple of details that he did with" C.D. Tyler testified that defendant "said that he would have her rub on his penis and that he would have her sit on him and ride him." Viewing this evidence in the light most favorable to the State, we conclude that a rational juror could have found defendant committed the offense of aggravated criminal sexual abuse wherein defendant committed an act of sexual conduct by rubbing his penis on the vagina of C.D.

¶ 57    Count IV alleged that between the dates of May 1, 2000, and December 11, 2003, defendant committed the offense of aggravated criminal sexual abuse in that defendant committed an act of sexual conduct by rubbing his penis on the face of C.D., a female minor child born on December 11, 1989, at a time when C.D. was under the age of 18 and a family member of defendant, in violation of section 12-16(b) of the Code (*id.*), a Class 2 felony. C.D. testified that while living at the College Drive home, defendant would cook dinner and "trap my sister and I under his shirt while he had an erection and proceed to stir food and poke us with his erection." C.D. clarified that defendant would pull his shirt over her head while he was standing. C.D. was also standing, but she was at his hip-level. C.D. was approximately 10 years old when this first started. When defendant pulled C.D., and often F.D., too, under his shirt, he was erect. Defendant would "stir food on the stove." Defendant "would intentionally turn a little to stir." As he turned, "he would poke us with it." C.D. testified that this occurred until their youngest brother was born.

18

¶ 58    On cross-examination, C.D. testified that defendant's "elbow would push [her] head down," which would put her face "at eye level" with defendant's erection. On cross-examination, defense counsel asked, "So it wasn't just that he would move, he would force your head down?" C.D. responded, "Yes."

¶ 59    F.D. corroborated C.D.'s testimony when she testified to nearly identical conduct. F.D. testified that while living in the College Drive home, defendant would be in the kitchen cooking dinner with an "erection." Defendant "would put mine and [C.D.'s] head underneath his shirt." F.D. testified that "his erection would be in between the both of us," "[r]ight in front of my face." F.D. had "one memory of that." She could not recall how old she was, but it was while defendant and her mother were married and living at the College Drive home. Viewing this evidence in the light most favorable to the State, we conclude that a rational juror could have found that defendant committed the offense of aggravated criminal sexual abuse where defendant committed an act of sexual conduct by rubbing his penis on the face of C.D.

¶ 60    Count V alleged that between the dates of May 1, 2000 and August 2, 2006, defendant committed the offense of predatory criminal sexual assault of a child, in that defendant, knowing that F.D. was unable to give knowing consent, committed an act of sexual penetration by the insertion of his finger into the vagina of F.D. being a female minor child born on August 3, 1993, at a time when F.D. was under the age of 13 years and the defendant was 17 years of age or older, in violation of section 12-14.1(a)(1) of the Code (*id.* § 12-14.1(a)(1)), a Class X felony. F.D. was 29 years old at the time of testifying. She was born on August 3, 1993. F.D. knew defendant, because he married her mother when F.D. was three years old. F.D. was approximately 13 years old at the time of their divorce. During the marriage, F.D. was often in the care of defendant while her mother worked.

19

¶ 61    First, defendant argues that there was no clear testimony from F.D. that defendant inserted his finger into her vagina while in a vehicle. Therefore, defendant contends that the State failed to establish his guilt beyond a reasonable doubt as to count V. We disagree.

¶ 62    F.D. testified that the family was in Oakland City at her aunt's house for New Year's Eve. F.D. was on the couch feeling tired. Defendant carried her to her mother's van. Defendant "cradled" her and unbuttoned and unzipped her pants. Defendant put "his fingers in [F.D.] the whole way home" while F.D.'s mother drove the van home. F.D. tried to "push [her] foot against his arm and pin it up against the door to try and get him to stop." However, she "wasn't strong enough to get him to stop." She did not ask her mother for help. She "tried to act like [she] was asleep." F.D. testified that defendant went underneath her underwear and inserted what she believed to be his thumb into her vagina. F.D. believed that she was seven years old when this occurred.

¶ 63    As noted above, corroborating evidence is unnecessary to sustain a conviction (*Siguenza-Brito*, 235 Ill. 2d at 228 (testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant)), and yet, once again, F.D.'s testimony was corroborated by both her mother, Jennifer Hale, and Tyler. Hale testified that the family owned a purple Dodge Grand Caravan while living on College Drive. Hale recalled driving home from Aunt Elaine's house on New Year's Eve, while pregnant with her youngest son. Defendant had been drinking. C.D. and Tyler sat in the back seat and defendant held F.D. in the middle seat. Hale testified that it was "out of character" for defendant to hold F.D. on the way home, because usually "we strapped the children in." Defendant "carried her" because F.D. was asleep.

¶ 64    Likewise, Tyler testified that when the family left a New Year's Eve party, defendant held F.D. in the car on the way home. Defendant held F.D. "while we were driving." Tyler testified that

20

he "thought it was weird that he was holding her." Defendant also testified about the party, noting that he had been drinking, was too drunk to drive home, and held F.D. for the drive home. Viewing this evidence in a light most favorable to the State, we conclude that a rational juror could have found that defendant committed the offense of predatory criminal sexual assault of a child where defendant committed an act of sexual penetration by the insertion of his finger into the vagina of F.D.

¶ 65    Defendant next argues that there was no clear testimony from F.D. as to her age when she alleged that defendant inserted his fingers into her vagina while giving her piggyback rides. Therefore, defendant contends that the State failed to establish his guilt beyond a reasonable doubt as to count V. We disagree.

¶ 66    F.D. testified that defendant gave her piggyback rides "more than once" over the course of "years." F.D. testified that defendant did this to C.D. as well. F.D. testified that she was "fully clothed" and had "underwear on" but defendant "would go under [her] underwear with his thumbs." F.D. testified that defendant used "both his thumbs." F.D. did not recall wearing nightgowns at home. F.D. testified that the piggyback rides ended when defendant and her mother divorced, when F.D. was 13. Given that F.D. testified that the piggyback rides occurred over the course of "years," F.D. plainly established that the events took place prior to her turning 13. Thus, a rational juror could have found that defendant committed the offense of predatory criminal sexual assault of a child where defendant committed an act of sexual penetration by the insertion of his finger into the vagina of F.D.

¶ 67    Count VI alleged that between May 1, 2000, and January 2, 2007, defendant committed the offense of aggravated criminal sexual abuse in that defendant committed an act of sexual conduct by rubbing his penis on the face of F.D., a female minor child born on August 3, 1993, at

21

a time when F.D. was under the age of 18 and a family member of the defendant, in violation of section 12-16(b) of the Code (720 ILCS 5/12-16(b) (West 2000)), a Class 2 felony. F.D. testified that while living in the College Drive home, defendant would be in the kitchen cooking dinner with an "erection." Defendant "would put mine and [C.D.'s] head underneath his shirt." At the time, F.D. thought it was funny. She recalled that she "could clearly see that he had an erection." She clarified that "his erection would be in between the both of us," "[r]ight in front of my face." F.D. had "one memory of that." She could not recall how old she was, but it was while defendant and her mother were married and living at the College Drive home. As noted above, this evidence is corroborated by C.D.'s nearly identical testimony. Viewing this evidence in the light most favorable to the State, we conclude that a rational juror could have found the evidence sufficient to find defendant committed the offense of aggravated criminal sexual abuse in that defendant committed an act of sexual conduct by rubbing his penis on the face of F.D.

¶ 68    In sum, we cannot say that the evidence presented was so "unreasonable, improbable, or unsatisfactory" that, even when viewed in the light most favorable to the State, no rational trier of fact could accept it as proof beyond a reasonable doubt. *Ross*, 229 Ill. 2d at 272. Thus, we conclude that the evidence was sufficient to support defendant's convictions for predatory criminal sexual assault of a child and aggravated criminal sexual abuse.

¶ 69                                B. Duplicity

¶ 70    Next, defendant argues that the information for count V was void for duplicity when the State argued to the jury that two separate factual occurrences sufficed to convict defendant of the one crime alleged in count V. We disagree.

¶ 71    A charging instrument is void for duplicity where two or more distinct offenses are charged in a single count. *People v. Ross*, 21 Ill. 2d 419, 420-21 (1961). A duplicitous charging instrument

22

is considered defective because it "does not set forth the nature and elements of the charge with certainty." *People v. Edwards*, 337 Ill. App. 3d 912, 921 (2002). Even where a charging instrument is defective, it may nevertheless provide notice sufficient for the preparation of a defense and satisfaction of the due process requirement. See, *e.g.*, *People v. Kennebrew*, 2013 IL 113998, ¶ 53. The parties agree that sufficiency of a complaint is a question of law that we review *de novo*. *People v. Espinoza*, 2015 IL 118218, ¶ 15.

¶ 72 Because defendant raised a challenge to the information after the trial began, he must establish that he was prejudiced in the preparation of his defense. "When the instrument is challenged for the first time after trial, a defendant will attain relief only where he demonstrates that the instrument provided notice of the charge or charges that was so insufficient as to prejudice the preparation of his defense." *People v. Panozzo*, 2022 IL App (3d) 190499, ¶ 38.

¶ 73 Here, the information provided sufficient notice of the charges against defendant. Count V properly set forth the name of the offense, the statutory provision alleged to have been violated, the nature and elements of the offense charged, the date and county of the offense as definitely as can be done, and the name of the accused, in compliance with section 111-3(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(a) (West 2000)). "Duplicity is the joinder of two or more distinct offenses in the same count of an indictment." *Ross*, 21 Ill. 2d at 420-21. "It arises from charging more than one offense, and not from charging a single offense in more than one way, or pleading different acts contributing to the ultimate charged offense ***." *Id.* at 421.

¶ 74 In the case before us, defendant was charged with one count of predatory criminal sexual assault of a child in that defendant committed an act of sexual penetration by inserting his finger into the vagina of F.D. During the trial, the State presented two factual instances, both within the requisite time frame, that could meet the elements of the offense. The State presented evidence

23

that defendant inserted his finger into F.D.'s vagina while giving her a piggyback ride while the family resided on College Drive. The second instance occurred while defendant held F.D. in the purple van on the way home from the New Year's Eve party. In rejecting defendant's duplicity argument, the trial court determined that both instances of predatory criminal sexual assault took place during the time period listed in the information. The court noted that the two instances could have been charged in two separate counts. However, the court determined that defendant was not prejudiced by being charged with only a single count related to F.D. Moreover, the trial court properly noted that defendant was on notice of both allegations based on the discovery in this case.

¶ 75    Here, the State presented testimony and evidence that set forth different acts which contributed to the ultimate charged conduct. The evidence was not a surprise to defendant, as the trial court noted that the evidence was available to defendant through the discovery process. There were many options available to defendant and his counsel throughout the proceedings to glean more insight into the specifics of the conduct alleged by the State, including filing a bill of particulars pretrial or simply requesting particularized guilty verdicts following the denial of his motion for a directed verdict. In summary, the information properly apprised defendant of the charges stemming from his conduct with F.D. Accordingly, the information is not void for duplicity.

¶ 76    Defendant seemingly argues that he could be prejudiced in the future if the State sought to prosecute him for predatory criminal sexual assault based on one of the two acts argued before the jury. Defendant argues that it is not clear for which specific factual event the jury found defendant guilty. As such, he argues that a future prosecution may not be barred under principles of compulsory joinder and double jeopardy. However, the State responds, noting that compulsory joinder would apply to either instance and therefore would bar future prosecution. Thus, the State

24

notes that defendant's conviction protects defendant from future prosecution under either double jeopardy or compulsory joinder. Thus, the State contends that defendant failed to establish prejudice.

¶ 77    First, any argument related to compulsory joinder is premature at this stage of the proceedings. Compulsory joinder often arises in the context of speedy trial issues, where additional charges are subsequently filed at a later date. Under those circumstances, it must be determined whether the compulsory joinder rule applies. The compulsory joinder statute provides, in pertinent part, as follows:

> "If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, except as provided in Subsection (c) [(where the court may order a separate trial in the interest of justice)], if they are based on the same act." 720 ILCS 5/3-3(b) (West 2000).

¶ 78    In the case before us, the State charged defendant with predatory criminal sexual assault through count V of an information on May 3, 2021. The State never brought additional charges at any point later in the trial. As such, compulsory joinder is inapplicable in this matter. Defendant's double jeopardy argument requires this court to engage in a similar fallacy. If the State, for reasons unbeknownst to this court, ever brought additional charges at a later time against defendant for the specific facts known to them on May 3, 2021, then certainly defendant could raise compulsory joinder and double jeopardy at that time. However, it is premature to do so at this juncture. Because defendant only makes a speculative claim of future prejudice, we decline to afford him relief where he failed to demonstrate that the information "provided notice of the charge or charges that was so

insufficient as to prejudice the preparation of his defense." *Panozzo*, 2022 IL App (3d) 190499,

¶ 38.

¶ 79                            III. CONCLUSION

¶ 80    For the foregoing reasons, we affirm the judgment of the circuit court of Wabash County.

¶ 81    Affirmed.